PURCHASE AND SALE AGREEMENT

BETWEEN

CASA CASUARINA LLC, AS CHAPTER 11 DEBTOR IN POSSESSION

as Seller

AND

as Buyer

_____

Property: 1116 Ocean Drive, Miami Beach, FL

Dated as of: _____, 2013

**PURCHASE AND SALE AGREEMENT**

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated _____ 2013 between CASA CASUARINA LLC, as debtor in possession (the "Debtor" or "Seller") and_____ (the "Buyer") recites and provides:

### RECITALS

The Debtor is the owner of the real property located at 1116 Ocean Drive, Miami Beach, FL which real property is described on Exhibit A hereto, together with all improvements thereon and appurtenances thereunto (the "Real Property").

A voluntary petition for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") was filed by the Debtor in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") on July 3, 2013. The case of the Debtor is pending in the Bankruptcy Court as Case No. 13-25645-LMI (the "Bankruptcy Case"). The bankruptcy estate of the Debtor is referred to herein as the "Estate."

The Debtor believes that it is in the best interests of the Estate to sell the Property (defined below) to the Buyer, and the Buyer wishes to purchase the Property from the Debtor, all subject to the approval of the Bankruptcy Court and as more particularly provided below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows.

### AGREEMENT

1. <u>Court Approval</u>. The parties' respective obligations to purchase and sell the Property pursuant to this Agreement are subject to Bankruptcy Court approval after notice and a hearing, subject to higher and better offers, and the provisions, requirements and limitations of the Sale Order (defined below).

2. <u>Sale and Purchase of Property</u>. Subject to the terms and conditions of this Agreement and the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to Buyer, and Buyer shall purchase and acquire from Seller, Seller's right, title and interest in the following (collectively, the "Property"):

   2.1. The Real Property described in Exhibit A; located at 1116 Ocean Drive, Miami Beach, Florida.

   2.2. All personal property located within the Property, other than any property specifically excluded herein;

3. <u>Conveyance of Property</u>.

3.1. Subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, the Seller shall execute and deliver to the Buyer on the Closing Date the following instruments pursuant to which the Seller shall sell, assign, transfer, convey and deliver the Property to the Buyer free and clear of all Liens in accordance with sections 363(b) and (f) of the Bankruptcy Code, with such Liens to attach to the proceeds of sale, on an AS-IS, WHERE-IS BASIS, WITHOUT REPRESENTATIONS OR WARRANTIES:

3.2. The Debtor's Quitclaim Deed (the "Deed") conveying the Real Property to Buyer, which shall be free and clear of any and all encumbrances and restrictions in accordance with section 363(f) of the Bankruptcy Code, except that the Seller shall convey marketable title subject to: comprehensive land use plans, zoning, restrictions, prohibitions and other requirements imposed by governmental authority; restrictions and matters appearing on the plat or otherwise common to the subdivision; outstanding oil, gas and mineral rights of record without right of entry; unplatted public utility easements of record; and taxes for year of Closing and subsequent years; provided, that there exists at Closing no violation of the foregoing and nothing preventing use of the Property for residential or commercial purposes.

4. <u>Reserved</u>.

5. <u>Deposit</u>

5.1. Within 24 hours of becoming the Successful Bidder, Buyer shall have deposited the additional sum of 10% of the Successful Bid (this sum, plus the $3,000,000.00 escrow deposit together shall be referred to hereafter as the "Deposit"). The Deposit will be wired to Seller's Counsel, Marshall Socarras Grant, P.L to be held in the escrow account of Marshall Socarras Grant, P.L (the "Deposit Agent"). The Deposit shall be held without interest and shall be applied against the Purchase Price at Closing. If the Closing fails to occur because this Agreement is not approved by the Bankruptcy Court the Deposit shall be returned to Buyer, however if the closing fails to occur as the result of Buyer's unexcused failure to perform its obligations, then the entire Deposit shall retained by the Seller as liquidated damages.

5.2. If all of the contingencies set forth in Section 10 are satisfied or waived in writing by Buyer, and Seller then fails, after the entry of the Sale Order, to close on the sale of the Property to Buyer as required by this Agreement, Buyer shall be entitled to a refund of the Deposit, as its sole and exclusive remedy and as liquidated damages for Seller's failure to close.

6. <u>Purchase Price</u>. The purchase price for the Property shall be $_____, which does not include the Buyer's 4% Premium. At the Closing, Buyer shall, as additional consideration, pay to the Seller the closing costs which shall be allocated as set forth in Section 12, as well as the Buyer's Premium, as set forth in

Section 18. (the total amount to be paid at closing shall be referred to hereafter as the "Purchase Price")

7. <u>Bankruptcy Court Approval, Competing Transactions and no Due Diligence Period</u>.

    7.1. Seller shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the sale of the Property to the Buyer pursuant to this Agreement (the "Sale Order"), which shall contain the following provisions:

    (a) a finding that Seller prepared and mailed a motion seeking the Sale Order, and such motion and notice were proper and sufficient as to all parties entitled to same;

    (b) the sale and transfer of the Property to the Buyer is approved pursuant to Sections 105 and 363(f) of the Bankruptcy Code;

    (c) the sale of the Property to Buyer pursuant to this Agreement will be free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens, attaching to the sale proceeds; however Seller shall convey marketable title subject to: comprehensive land use plans, zoning, restrictions, prohibitions and other requirements imposed by governmental authority; restrictions and matters appearing on the plat or otherwise common to the subdivision; outstanding oil, gas and mineral rights of record without right of entry; unplatted public utility easements of record; and taxes for year of Closing and subsequent years; provided, that there exists at Closing no violation of the foregoing and nothing preventing use of the Property for residential or commercial purposes.

8. <u>Competing Transactions</u>. This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids other than from the Buyer pursuant to auction procedures approved by the Bankruptcy Court (each a "Competing Bid"). From the date hereof (and any prior time) and until the completion of the auction contemplated hereby or as otherwise directed by the Bankruptcy Court, Seller is permitted to cause his respective representatives to initiate contact with, solicit or encourage submission of any inquiries proposals or offers by, any person (in addition to the Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Property. In addition, the Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Property and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Property to prospective buyers. If a Competing Bid is approved by the Bankruptcy Court, this Agreement will nevertheless survive and remain in effect during the period specified in the Order approving the Bid Procedures Motion and shall serve as a stand-by bid as contemplated in such Order.

9. <u>No Due Diligence Period</u>. There shall be no due diligence period following execution of this Agreement.

10. <u>Conditions to Obligations of Buyer</u>. The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before Closing of each and every one of the following conditions, which may be waived in whole or in part by Buyer:

10.1. the Sale Order shall have been entered by the Bankruptcy Court, and the Sale Order shall contain findings set forth in Section 7.1(a) above; and

10.2. the representations and warranties of Seller shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Seller shall not be in default in any material respect under the provisions of this Agreement.

10.3. If any of the foregoing conditions is not substantially satisfied by Seller or waived by Buyer before or at the Closing, Buyer may terminate this Agreement and Seller shall forthwith return the Deposit to the Buyer, and neither Party shall have any further obligations to the other.

11. <u>Conditions to Obligations of Seller</u>. The obligations of the Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before the Closing of the following conditions, which may be waived in whole or in part, by the Seller:

11.1. the Sale Order shall have been entered by the Bankruptcy Court;

11.2. the representations and warranties of Buyer shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Buyer shall not be in default in any material respect under the provisions of this Agreement; and

11.3. Buyer shall have paid to the Seller the Purchase Price.

12. <u>Closing</u>.

12.1. Unless otherwise agreed to by the Seller and Buyer in writing, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place on a business day between 15 and 20 days after entry of the Sale Order, or 5 calendar days after the Sale Order is final and not subject to appeal, whichever is later (the "Closing Date"). Notwithstanding anything herein to the contrary, if the Sale Order has been stayed by an order of a court of competent jurisdiction, then the Closing Date shall be postponed until not more than five (5) business days after the stay has been finally dissolved. If such postponement is longer than 120 days, Buyer and Seller shall each have the right to terminate this Agreement by giving written termination notice to the other, in which case neither Party shall have any further obligations under this Agreement except those that expressly survive the termination of this Agreement.

12.2. Closing shall be conducted through Marshall Socarras Grant, P.L. Closing shall take place at the offices of Marshall Socarras Grant, P.L., 197 S. Federal

Highway, Suite 300 Boca Raton, FL 33432 (or such other place as the parties may designate in writing). Buyer shall wire the full amount of the Purchase Price less any prior deposits into the trust account of Marshall Socarras Grant, P.L. whereupon title will be delivered to the Buyer.

12.3. At the Closing, Seller shall deliver to the Buyer the transfer instrument provided for in Section 3.

12.4. At the Closing, Buyer shall deliver to the Seller the Purchase Price as provided in Section 6.

12.5. The cost of providing title evidence covering the period prior to closing, state documentary stamps which are required to be affixed to the instrument of conveyance, any surtax costs, and the cost of recording any corrective documents shall be paid by Buyer. The cost of recording the deed and the cost of the issuance of the Title Insurance Policy shall be paid by Buyer. Each party shall pay its own attorney's and accounting fees.

12.6. Buyer shall pay, on the Closing Date, the cost of recording the deed and the cost of the issuance of the title insurance policy premium for any owner's title insurance policy (and any loan policy) obtained by Buyer, the cost of all title updates, title examination, and lien searches, and the cost of any inspections and/or surveys, any settlement fees charged by the Person conducting the Closing, and all other costs and charges of Closing. Each Party shall pay its own attorneys' fees.

13. <u>Prorations</u>. Real property taxes and assessments for the tax year in which the Closing occurs, and all utility bills shall be apportioned between Buyer and Seller as of the Closing Date. The provisions of this Section 13 shall survive the Closing.

14. <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Buyer that Seller is the Chapter 11 debtor in possession and that, subject to the entry of the Sale Order without any contrary order being obtained by any party in interest, Seller has the power to convey the Property to Buyer pursuant to this Agreement subject to Bankruptcy Court approval and in accordance with the provisions of the Sale Order approved by the Bankruptcy Court.

15. <u>Representations and Warranties of Buyer</u>. Buyer hereby represents and warrants to Seller, which representations and warranties shall survive Closing, as follows:

15.1. This Agreement is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

15.2. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, and any rules, regulations, permits, licenses and orders promulgated thereunder.

15.3. BUYER, ON BEHALF OF ITSELF AND ANY AFFILIATES OR RELATED PARTIES, UNDERSTANDS AND AGREES THAT THE PROPERTY IS SO ASSIGNED, LEASED, TRANSFERRED AND CONVEYED TO BUYER IN "AS IS" CONDITION ON A "WHERE IS" BASIS, WITH NO CONTINGENCIES OF ANY KIND INCLUDING FINANCING OR DUE DILIGENCE AND WITHOUT ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT.

16. <u>Default and Remedies</u>.

16.1. If the Closing fails to occur because of a default, misrepresentation or breach of warranty by Buyer, Seller shall be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property. In any such event, Buyer shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

16.2. If the Closing fails to occur solely because of a default by Seller under the provisions of this Agreement, the Sale Order or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, then Buyer may, as its exclusive remedy, receive a return of its Deposit and terminate this Agreement by notice to Seller.

17. <u>Risk of Loss</u>. Risk of loss to the Real Property or any part thereof from damage or destruction by fire or other casualty or by reason of condemnation shall remain upon the Seller until the Closing.

18. <u>Buyer's Payment of Buyer's Premium and No Claims of Brokers</u>. The commissions earned by Jill Hertzberg and Jill Eber (the "Jills") and Lamar Fisher and Fisher Auction Company (the "Auctioneer") all be paid along with the sale proceeds and shall be in the form of a 4% "Buyer's Premium.", subject to Bankruptcy Court approval, to market and auction the Property. This Agreement contemplates an additional 4% Buyer's Premium. The Buyer's Premium is paid by the buyer in addition to the Successful Bid amount and is incorporated in the Purchase Price. Seller shall not be responsible for any broker's commissions. Buyer shall indemnify and hold the Seller harmless from theclaims of any other broker or finder claiming through the Buyer. The provisions of this Section shall survive the Closing and any termination of this Agreement

18.1. The 4% Buyers Premium shall be allocated as set forth in subsections 18.2 - 18.6

18.2. Fisher Auction Company shall receive 1.5% of the final bid price

18.3. the Jills shall receive 1.5% of the final bid price

18.4. a procuring cause broker shall receive 1% of the final bid price

18.5. Should the property be purchased without a procuring cause broker and/or the Jills become the procuring cause broker, the Jills will receive an additional .5% of the final bid price and Fisher Auction Company shall receive an additional .5% of the final bid price.

18.6. If the property is purchased wholly by credit bid, the credit bidder will be responsible for a 2% buyer's premium, with the Jills and Fisher Auction Company each to receive 1%, and no other broker to receive any commission.

19. Deposit Agent Provisions.

19.1. If conflicting demands relating to this Agreement are made upon the Deposit Agent, the parties hereto expressly agree that the Deposit Agent shall have the absolute right to do either or both of the following: (i) withhold and stop all actions in performance of this escrow and await settlement of the controversy by final appropriate legal proceedings or as otherwise mutually directed in writing by Buyer and Seller; or (ii) file suit in declaratory relief or interpleader and obtain an order from the Bankruptcy Court requiring the parties to interplead and litigate in such court their several claims and rights amongst themselves. Upon the filing of any such declaratory relief or interpleader suit and depositing with the Bankruptcy Court all funds deposited by the parties under this Agreement, the Deposit Agent shall thereupon be fully released and discharged from any and all obligations to further perform the duties or obligations imposed upon it by this Agreement.

19.2. In no event shall Deposit Agent be liable for any act or omission under or in respect of this Agreement except where Deposit Agent's acts or omission is the result of its gross negligence or willful misconduct. Accordingly, Deposit Agent shall not incur any liability with respect to (i) any action taken or omitted in good faith, including upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of the Deposit Agent under this Agreement, or (ii) any action taken or omitted in reliance on any instrument, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which Deposit Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

19.3. Seller acknowledges that Deposit Agent also serves as Seller's legal counsel in connection with this Agreement, and both Seller and Buyer consent to Deposit Agent serving in such dual capacity. In the event of any actual dispute or adversity between Seller and Buyer, Deposit Agent shall be entitled to resign as Deposit Agent and to represent Seller in such dispute or adversity, and in such case shall deliver any funds held by Deposit Agent pursuant to this Agreement the Funds either to a successor escrow agent designated by Seller and Buyer as provided above, or to a court of competent jurisdiction as provided for above.

20. Definitions; Rules of Construction.

20.1. The following terms have the following meanings in this Agreement:

(a) "Legal Costs" means court costs and attorneys' fees and costs, including the costs of paralegals, whether or not any mediation, arbitration or legal proceeding is filed, or if any mediation, arbitration or legal proceeding is filed, then all such costs incurred at any point in such mediation, arbitration or legal proceeding, including trial and all levels of appeal.

(b) "Lien" means "any interest in" the Property as used in Section 363(f) of the Bankruptcy Code and includes any lien (including any tax lien or judgment lien), pledge, security interest, mortgage or lis pendens, contracts, options or other rights to acquire any condominium units or any other interest in the Property, but does not include any easements or restrictions of record.

(c) "Party" or "Parties" mean the Seller and/or Buyer, as the context may indicate.

(d) "Person" means any individual or any corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or other legal entity or a government or governmental entity.

20.2. As used in this Agreement: (i) words in the singular shall be held to include the plural and vice versa, (ii) words of one gender shall be held to include the other genders as the context requires, (iii) the terms "hereof", "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement and not to any particular provision of this Agreement, (iv) references to Section, paragraph, Exhibit and Schedule are references to the Sections, paragraphs, Exhibits and Schedules of this Agreement, unless otherwise specified, (v) section headings in this Agreement are solely for convenience of reference, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement, (vi) the word "including" and words of similar import when used in this Agreement, shall mean "including, without limitation," unless otherwise specified, and (vii) the word "or" shall not be exclusive.

20.3. Any terms not defined in this agreement shall have the meaning as defined in:

(a) The Debtor's Motion to sell the Property filed with the Bankruptcy Court on _____; or

(b) 11 U.S.C. § 101.

20.4. Each Party and its counsel have reviewed and revised this Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or of any amendments or exhibits to this Agreement.

21. <u>Miscellaneous</u>.

21.1.   This Agreement and the Schedules to this Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

21.2.   This Agreement, together with the Schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

21.3.   All notices and other communications under this Agreement shall be in writing and shall deemed given if delivered personally or mailed by registered or certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged) or delivered by an recognized overnight delivery system (such overnight notice to be effective on the date of receipt) as follows:

21.4.   Only Executory Contracts identified by Buyer to the Seller in writing (1) business day prior to the Auction may be assumed by Seller and assigned to the Buyer. The seller may assume and assign the contracts subsequent to the sale hearing by separate motion seeking the Courts approval of the assumption and assignment of Designated Contracts to the Successful Bidder.

21.5.   <u>Notices</u>. All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered or mailed, postage prepaid, certified mail, return receipt requested or by overnight express mail (i.e. Federal Express) as follows:

    If to Buyer, addressed to:

    With a copy to:

If to Seller, addressed to:

Marshall Socarras Grant, P.L.
197 South Federal Highway, Suite 300Boca Raton, FL 33432

or to such other place and with such other copies as either Party may designate as to itself by written notice to the others.

21.6. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile signatures shall be accorded the same enforcement rights as an original. Regardless of whether the transactions contemplated by this Agreement are consummated, each Party shall pay its or their own costs and expenses, including Legal Costs and investment banking, accounting, consulting, and other professional fees, incurred in connection with the negotiation, preparation, investigation and performance by such Party of this Agreement and the transactions contemplated under this Agreement.

21.7. Time is of the essence with respect to each Party's obligations hereunder.

21.8. This Agreement shall not be recorded by Buyer and, if recorded by Buyer, Seller may immediately terminate all of its obligations under this Agreement, and Buyer shall pay Seller's Legal Costs in removing this Agreement of record. The provisions of this Section 25 shall survive the Closing.

21.9. If the last day of any time period provided for in this Agreement falls on a Saturday, Sunday or holiday, the last day shall be extended until the next business day that banks operating in Miami, Florida are open for business, but in no case will the extension be for more than three days. For purposes of this Agreement, "business day" shall mean any day other than a Saturday, a Sunday, or any other day on which banking institutions in Miami, Florida, are closed or are authorized to be closed, including all legal holidays.

21.10. Notwithstanding any other provision of this Agreement, any representation, warranty or covenant of Seller contained in this Agreement that by its terms survives Closing or the termination of this Agreement, shall not survive the closing of the Bankruptcy Case.

21.11. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines

have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from county public health units.

21.12. The determination that any covenant, agreement, condition or provision of this Agreement, which is not necessary to the enjoyment by either party of the benefit contemplated herein, is invalid shall not affect the enforceability of the remaining covenants, agreements, conditions or provisions hereof and, in the event of any such determination, this Agreement shall be construed as if such invalid covenant, agreement, condition or provision were not included herein.

21.13. No failure or delay of either Party in the exercise of any right given to such Party hereunder shall constitute a waiver thereof unless the time specified herein for exercise of such right has expired, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or of any other right. The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

21.14. The rights and obligations of Buyer hereunder may be assigned to one or more affiliated entities without the consent of Seller, and to any unaffiliated third party with the prior written consent of Seller. No assignment under this provision shall relieve Buyer of liability to Seller for amounts accruing under this Agreement. This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the parties hereto. The Parties neither intend to confer any benefit hereunder on any Person other than the parties hereto, or shall any such third party have any rights hereunder.

21.15. This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without reference to its choice or conflicts of laws principles. Each Party: (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

21.16. BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT.

WITNESS the following signatures as of the date in the preamble.

BUYER:

_____

SELLER:

_____
Casa Casuarina, LLC
By: Peter Loftin, Managing Member

EXHIBIT A

LEGAL DESCRIPTION

Property Described in the land records of Miami-Dade County, Florida as:

```
Lots 5, 6 and 7, in Block 16, of OCEAN BEACH ADDITION NO. 2,
according to the Plat thereof,: as recorded in Plat Book 2, at
Page(s) 56, of the Public Records of Miami-Dade County, Florida.
```