1                     UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF FLORIDA
2
                      Judge Laurel Myerson Isicoff
3

4    IN RE:

5    CASA CASUARINA,          CASE NO: 13-25645-BKC-LMI
             Debtor.
6    _____ /

7

8
             EMERGENCY MOTION TO APPOINT TRUSTEE (4),
9            EMERGENCY MOTION FOR RELIEF FROM STAY TO
             OBTAIN INSURANCE AND SECURITY FOR PROPERTY
10           AND ADVENCE COSTS ADDITIONAL INDEBTEDNESS
             UNDER THE LOAN DOCUMENTS AND FOR RELATED
11                          RELIEF (9)

12
                          JULY 3, 2013
13

14

15        The above-entitled cause came on for hearing

16   before the HONORABLE LAUREL M. ISICOFF, one of the

17   Judges in the UNITED STATES BANKRUPTCY COURT, in and

18   for the SOUTHERN DISTRICT OF FLORIDA AT LARGE, at 51

19   SW 1st Avenue, Miami, Dade County, Florida, commencing

20   at or about 4:00 p.m. on July 3rd, 2013, and the

21   following proceedings were had:

22

23

24                     Reported by: Carmen E. De La Cruz

25

```
 1                   APPEARANCES:
 2         MARSHALL, SOCARRAS & GRANT, by
           JOE GRANT, Esq.
 3         ADAM MARSHALL, Esq.
           On behalf of the Debtor.
 4
 5         GREENBERG TRAURIG, by
           MARK BLOOM, Esq.
 6         JOHN DODD, Esq.
           On behalf of VM South Beach.
 7              and
           ROBERT SPIEGLEMAN, Esq.
 8         (Via telephone)
           On behalf of VM South Beach.
 9
10         BAST AMRON, by
           MORGAN EDELBOIM, Esq.
11         On behalf of various wage claimants.
12
13         BERGER SINGERMAN, by
           PAUL SINGERMAN, Esq.
14         On behalf of Herbert Stettin,
           Chapter 11 Trustee for the bankruptcy
15           estate of Rothstein, Rosenfeldt & Adler.
16
           MIAMI DADE COUNTY ATTORNEY'S OFFICE, by
17         MINDY THORNTON, Esq.
           On behalf of Miami Dade County Tax Collector.
18
19
20         OFFICE OF THE UNITED STATES TRUSTEE, by
           STEVEN SCHNEIDERMAN, Esq.
21         ARIEL RODRIGUEZ, Esq.
22
23         ALSO PRESENT:
           EDWARD BARAJ, Esq.
24         Lead counsel for VM in the
           foreclosure action.
25
```

```
 1              THE COURT:  All right.  We're here this
 2   afternoon on Casa Casuarina, I believe is the
 3   pronunciation, but I'm sure someone will correct me if
 4   it is not.  And I'll take appearances starting with
 5   whomever is appearing by telephone.
 6              MR. SPIEGLEMAN:  Robert Spiegleman
 7   appearing by telephone for VM South Beach.
 8              THE COURT:  All right.  Mr. Spiegleman, I
 9   can barely hear you and did not hear on whose behalf
10   you were appearing.  If you could please use your
11   handset and speak louder, I would be very
12   appreciative.
13              MR. SPIEGLEMAN:  Okay.  Appearing for VM
14   South Beach.
15              THE COURT:  Okay.  Thank you.  All right.
16   Now from the courtroom, I'll start with the debtor.
17              MR. GRANT:  Good afternoon, Your Honor.
18   Joe Grant and Adam Marshall here on behalf of the
19   debtor.
20              THE COURT:  All right.  From VM?
21              MR. BLOOM:  Good afternoon, Your Honor.
22   Mark Bloom and John Dodd on behalf of VM.  Also
23   present in the courtroom is Edward Baraj, who is the
24   lead counsel for VM in the foreclosure action that
25   remains pending and stayed before Judge Ray.
```

```
 1            THE COURT:  Okay.  Thank you.
 2            MR. RODRIGUEZ:  Good afternoon,
 3    Your Honor.  Ariel Rodriguez on behalf of the United
 4    States Trustee.  Also with me is Steven Schneiderman.
 5            THE COURT:  All right.  Is there anyone
 6    here else -- oh, okay.  Anticipating my every move,
 7    Ms. Thornton.
 8            MS. THORNTON:  Good afternoon, Your Honor.
 9    Mindy Thornton, Assistant County Attorney on behalf of
10    the Miami-Dade County Tax Collector.
11            THE COURT:  Okay.
12            MR. SINGERMAN:  Good afternoon, Your
13    Honor.  May it please the Court, I'm Paul Singerman
14    from Berger Singerman.  Our firm is counsel to Herbert
15    Stettin in his capacity as Chapter 11 trustee for the
16    bankruptcy estate of Rothstein, Rosenfeldt & Adler.
17            THE COURT:  Okay.  Thank you.
18            MR. SINGERMAN:  Thank you, Judge.
19            MR. EDELBOIM:  Good afternoon, Your Honor.
20    Morgan Edelboim of the law firm Bast Amron.  We are
21    representing various wage claimants in the case.
22            THE COURT:  Okay.  All right.  I have,
23    Mr. Bloom, your emergency motion to appoint trustee,
24    and an emergency motion for relief to obtain
25    insurance.  So, please proceed.
```

1          MR. BLOOM:  Thank you, Your Honor.

2          THE COURT:  Oh, and as you make your

3   remarks, obviously, I'll ask you to respond or address

4   the debtor's response as well as the motion that has

5   been filed by the debtor with respect to the

6   auctioneer.

7          MR. BLOOM:  Happy to do that, Your Honor.

8          THE COURT:  Uh-huh.

9          MR. BLOOM:  In connection with the two

10  motions that the Court has referenced, we also filed

11  this morning a request for judicial notice, and that

12  request related to certain litigation pending in

13  Miami-Dade, Florida Circuit Court and also the

14  foreclosure action last pending before Judge Ray, in

15  addition to another judgment and a tax lien.

16          We have certified copies of those

17  documents in a binder for the court.  I have

18  additional binders for counsel and for Your Honor's

19  law clerk.  If I may be permitted to pass them up?

20          THE COURT:  You may, but I'll determine

21  shortly how much evidence I'll be taking today, but I

22  did see your motion for judicial notice.

23          MR. BLOOM:  The two motions today are

24  closely interrelated.  They arise based upon a common

25  record of conduct that we believe falls clearly within

1   the scope of that contemplated by Section 1104 in

2   respect of the appointment of a trustee, and those

3   grounds, of course, are fraud, dishonesty,

4   incompetence or gross mismanagement by the debtor's

5   management either prior to or since the petition date

6   or, alternatively, appointment in the best interests

7   of creditors.

8           The motion for stay relief seeks on an

9   emergency basis to enable us to redress certain of the

10  same conditions that caused us to file the motion for

11  appointment of a trustee, namely the inadequacy of

12  insurance on the property and the absence, in our

13  view, of adequate security for the property.  And in

14  order to be able to effectuate those remedies which

15  would include ultimately our forced placing insurance

16  on the property as Judge Ray had recommended and also

17  obtaining security, we seek immediate relief over the

18  holiday weekend to enter onto the premises in order to

19  conduct a series of inspections that are necessary, A,

20  to bind coverage and, B, to assess the adequacy of

21  existing security.

22          Those inspections were to have taken

23  place, in accordance with Judge Ray's orders, at some

24  point in time last week.  Those orders, at least in

25  our view, were not complied with until ultimately we

1   had on Thursday an order from Judge Ray that granted

2   our motion to compel.  We then had agreement from

3   counsel for Casa that we could conduct the inspection

4   on Monday morning at ten o'clock, but were advised on

5   Friday evening that the Chapter 11 case would be filed

6   on Monday morning, and that, accordingly, all

7   proceedings arising out of the foreclosure action,

8   including the inspection that we thought as an element

9   of discovery in that foreclosure action, would also be

10  stayed.

11          Just to give the Court a bit of flavor for

12  what we're dealing with here.  We are well aware and,

13  in fact, Mr. Grant has done a very credible job of

14  keeping us aware of their efforts to obtain insurance

15  on the property over the last few days.  We're aware

16  of what he has attempted to put in place and

17  referenced in his objection to the motion to appoint a

18  trustee.  At the same time, what we do have, and it's

19  undeniable, is a debtor that comes into this court,

20  without adequate insurance on its property which is

21  its sole asset, which had no insurance at all on the

22  property, admittedly, had no insurance on the property

23  for a period of 25 days, and now as we head into a

24  holiday weekend during the Atlantic hurricane season,

25  has as yet no flood and no windstorm insurance on that

1   property.

2            We don't think that that is credible,

3   competent management, but it really doesn't begin

4   there, it goes back quite a ways.  I should point out

5   at the outset that in attacking and, I guess there's

6   no other word for it, in attacking the quality and the

7   integrity of this debtor's management, we're not

8   talking about a management team that has maybe one or

9   two weak links in it.  We're really talking about one

10  man, and that's Peter Loftin, who as I understand it,

11  is the managing member of the LLC that, in turn, is

12  the owner of the LLC that is before this court, Casa

13  Casuarina.

14           In Mr. Loftin we're also not dealing with

15  a long time experienced operator or manager of the

16  property here, and so we don't think that he's

17  entitled to any presumption that he's knowledgeable

18  about or able to direct the management of the

19  operations, whatever they are, or affairs of the

20  debtor.

21           In fact, back in December of 2009, three

22  and a half years ago, he turned over control of this

23  property to the restaurateur and caterer Barton G.

24  Weiss, the entity 1116 Ocean Drive that is now in

25  litigation with Mr. Loftin and Casa in the Dade County

1   Circuit Court.  Actually, six months before then he

2   had turned over operation of that property as a hotel,

3   event venue, restaurant, party, cabaret, whatever, to

4   Scott Rothstein and that didn't work out very well

5   either.

6            So, for really the past four years

7   Mr. Loftin has not been in direct control of this

8   property.  He's leased it out to people.  During the

9   period of the Barton G lease for three and a half

10  years, no real estate or personal property taxes were

11  paid, despite the fact that Mr. Loftin or Casa, I

12  should say, was receiving something along the lines of

13  $90,000 a month in rent under that lease.  And just

14  doing simple arithmetic, that's a-million-eighty

15  thousand dollars in a twelve month year times three

16  years or more, there is somewhere between and three

17  and three and a half million dollars that hasn't been

18  accounted for.

19           It's not in, from what we understand, the

20  debtor's bank accounts today and it certainly didn't

21  go to pay down the mortgage on which no payments have

22  been made since December of 2010.  It didn't go to pay

23  personal or property taxes, which under the lease may

24  have been Barton G.'s responsibility, but Casa is the

25  owner of the property, Casa has the legal obligation

1   to the taxing authorities to pay those taxes, even if

2   he contracts that obligation away to somebody else,

3   and he also had a contracturall obligation under our

4   loan documents to pay those things and they weren't

5   paid.

6              I think it's unfortunate, but it's worth

7   mentioning, and it's also in the exhibit register,

8   certified copies of which we would ask the Court to

9   take judicial notice, that it appears that it was

10  during this same period that Mr. Loftin had a judgment

11  entered against him in North Carolina, now

12  domesticated and recorded in Miami-Dade Circuit Court

13  among other places, a default judgment in excess of

14  $3.2 million, and most alarmingly he has what appears

15  to be an unsatisfied federal tax lien that was put in

16  place against him in May of 2011 for an amount in

17  excess of $18 million.

18              So, what we have during this period of

19  time leading up to today, when Your Honor is faced

20  with all of these good intentions that are advanced by

21  Casa's counsel, you have a whole history of neglect,

22  of incompetence and gross mismanagement of this

23  property.  I think it also fair to say that looking

24  back to this period, even since before 2009 and,

25  again, these are self-authenticating documents,

1  certified copies of court records that we've included

2  in the binder, and of which we'd ask the Court to take

3  judicial notice, that what Casa has left behind over

4  the last several years is a trail of litigation fueled

5  by broken promises.

6          This is not litigation that arose over the

7  fact that a debt was incurred and couldn't be paid.

8  It's litigation that goes directly to the heart of the

9  1104(a) test, fraud, dishonesty, incompetence and

10 gross mismanagement.  Mr. Loftin or Casa's first plan

11 for the property or an earlier plan for the property

12 was to sell club memberships to investors, and those

13 investors would have certain privileges.  Well, all of

14 the investors have sued, it was initially a class

15 action, but now plaintiffs have been added and the

16 request for class certification has been dropped, all

17 of this is reflected in the binder that we have, but

18 the action was filed seeking to rescind those

19 contracts because it is alleged that at some point in

20 time Casa simply said we've now turned over management

21 of the premises to Barton G., deal with him, and the

22 club memberships were dishonored.

23         Now, I don't offer those allegations, and

24 they are mere allegations, I'll be the first to tell

25 the Court that, I don't offer those allegations for

1   their truth, but I offer them to demonstrate a portion

2   of the trail of litigation that Casa has left behind,

3   and, again, it's not debtor/creditor type litigation.

4   The litigation that was commenced by the Barton G

5   entity 1116 Ocean Drive, is I think even more

6   critical.

7            Count I of that lawsuit accuses Casa and

8   its principal, Mr. Loftin, of fraud in the inducement.

9   And the alleged fraud takes several forms, including

10  representations and warranties in their lease, and it

11  is alleged orally as well that there was no problem

12  with the mortgage, that it was in good standing, that

13  there was no pending or threatened litigation with

14  respect to the property, when, in fact, it is alleged

15  that Casa and Mr. Loftin were aware of and had

16  received written demand letters and written notices of

17  default from the predecessor lender, West LB from

18  which our client acquired the note and mortgage.

19           So we have lawsuits seeking rescission

20  based upon contracts, contractual obligations that

21  were not performed that were simply walked away from.

22  We have a lawsuit alleging fraud in the inducement and

23  further alleging that when Mr. Loftin and Casa decided

24  to list the property a year ago for $125 million,

25  since lowered to 100 million, since lowered to 75

```
 1   million, we're not aware that they have any offers
 2   that meet those criteria as yet, and, in fact, in the
 3   litigation, in related litigation before Judge Ray,
 4   they were under a continuing obligation to produce
 5   documents to us, but we've not seen anything in that
 6   regard.  But during the course of listing the
 7   property, Mr. Loftin it is alleged and, in fact, it's
 8   printed in the New York Times, made statements that,
 9   in Barton G.'s view, disparaged his business and made
10   it impossible to do business on the 6 to 12 months
11   lead time that it takes a to book a function of the
12   type that he does, representations Mr. Loftin has said
13   to have made regarding, there are lots of ways to get
14   rid of a lease.
15              Now, if we step back for a second and look
16   at maybe a higher altitude, at some of these
17   allegations, of what do they really reflect?  Casa
18   chased away the only tenant, the only source of
19   operating revenue, the source of the $90,000 a month
20   in leases, the source of all business operations of
21   the property, the payor of insurance on the property,
22   the person who provided for security of the property.
23   The property is now vacant, except for one thing and
24   this goes to the issue of security.  Our efforts to
25   determine the extent of security at the property were
```

1    fueled in large part by the Barton G lawsuit and

2    Barton G.'s related vacature of the premises.

3            We had understood, and I believe that it's

4    not in controversy, that Barton G. Pulled out and left

5    on May 31st.  And in June we became concerned about

6    the state of insurance and security at the property

7    and so, given how many things we were litigating over

8    with Casa and, frankly, with Mr. Singerman's client,

9    Mr. Stettin, in connection with the RRA case, I didn't

10   want one more fight, I didn't want a bunch of

11   discovery motions.  So what I did was write a letter

12   to counsel and say, as a matter of common interest,

13   with Barton G. Out, we've become concerned about

14   insurance and security for the property.

15           Our client VM is willing to advance the

16   cost necessary to provide adequate security at this

17   property.  Can you tell us about insurance and

18   security at the property?  And what we got were some

19   evasive answers and we got a rather defiant e-mail out

20   of the blue from Mr. Loftin himself that told us to

21   cease and desist and that he was spending upwards of

22   $50,000, his own words, on maintenance of the

23   property.  And so, when we got nowhere, and insurance

24   and security are critical issues and time critical

25   issues, we filed a request for production before

1  Judge Ray.

2          All of these documents, again, are in the

3  binder and we ask the Court to take judicial notice of

4  them, but we filed a second request for production of

5  documents in front of Judge Ray, a request for entry

6  on land for the purpose of making an inspection, and

7  we got Judge Ray to enter an order that shortened the

8  time to produce these documents to us.

9          Well, we got all of two documents, which

10  counsel certified were all the documents that his

11  client had.  We got that one page document that showed

12  insurance at levels that were far below that which is

13  required under our mortgage and far below the levels

14  that we think any prudent landowner would have for a

15  property like this one, didn't show any fire or

16  windstorm despite that fact that this is Ocean Drive

17  property directly across from the ocean and it is, of

18  course, the Atlantic hurricane season.

19          THE COURT:  You mean flood or windstorm?

20          MR. BLOOM:  Yes, I'm sorry.  Flood and

21  windstorm, yes.  But we got a one page document that

22  reflected that certain coverages were place.  That

23  documents refers in four different places to the

24  policies, but we never got any policies and we were

25  told we have all the documents.

1          We asked for security documents, too.
2    What did we get in the way of security documents?  We
3    got an -- and I mean, if it wasn't serious, it might
4    even be funny, we got a four or five-sentence e-mail
5    from an unidentified person to an unidentified person.
6    And this unidentified person is now said to be a Miami
7    Beach Police sergeant, we don't know one way or the
8    other, but we take that at face value, who claims that
9    by some arrangement with Casa or Mr. Loftin he's
10   living in the property with his wife and three
11   children and that that is supposed to pass for
12   security for this twenty-three or twenty-four-thousand
13   square foot mansion that's listed for sale for tens of
14   millions of dollars.  It's encumbered by a mortgage
15   with a debt in excess of $30 million.  No security
16   guards, no indication of any other security, but just
17   a supposed police officer who lives there with his
18   family.
19           Now, as we told Judge Ray, if, in fact,
20   there is an off-duty police officer living there and
21   that's the security, the fact of the matter is that
22   sometimes off-duty police officers have to go on duty
23   and that's hardly the type of security that we think a
24   property like this needs.
25           We also got, before I forget, no documents

1  responsive to our request that we find out what it was

2  that Mr. Loftin claimed to have spent $50,000 on, in

3  terms of maintenance and security for the property,

4  nothing whatsoever.  So, we still don't know about

5  that.  For all we know it was just puffing.

6          But having a -- having some people living

7  in the property, you know, this is not residential

8  property.  Yes, it was Gianni Versace's residence, but

9  for the last, you know, four or five, six, seven

10  years, it's been operated as a hotel, it's been

11  operated as a restaurant, as an event venue, and this

12  is not a simple piece of property and it's in a very

13  prominent place of Ocean Drive, known as, I understand

14  it, as the cabaret district.  It is surrounded on both

15  sides by hotels and restaurants, literally thousands

16  of people and thousands of cars drive by there every

17  day, and I can simply tell you that we're not

18  comforted by the fact that there is an off-duty police

19  officer living in the building.  That to us does not

20  constitute adequate security.

21          So, it's based upon this entire history

22  that we come before the Court.  We recognize and we do

23  give all due credence to the idea of what they say

24  they're going to do, they're going to get insurance,

25  but yet we go another weekend now, three weeks after

1   our client first stepped up and said, hey, we'll pay,

2   let's talk about getting insurance.  We go another

3   weekend into next week, probably without adequate

4   insurance, without flood and windstorm insurance.

5              So unless this court intervenes and from

6   our standpoint we go another weekend or as long as --

7              (Thereupon, the court reporter changed

8   paper.)

9              THE COURT:  I didn't mean to spoil the

10  start of anybody's 4th of July weekend.  This was just

11  in terms of availability.

12             MR. BLOOM:  As I was remiss in expressing

13  to counsels our appreciation that Your Honor fit us in

14  at all.

15             THE COURT:  I just didn't want you to

16  think I was picking on you, Mr. Bloom.

17             MR. BLOOM:  Whether it was four o'clock in

18  the afternoon, four o'clock in the morning, whatever

19  time.

20             We take at face value the good intentions

21  that are professed by this debtor through its counsel.

22  What we want the Court to take at face value and to

23  understand is that this really is too little too late.

24  There is a whole history here and it's not just about

25  acrimony that may exist between Mr. Loftin and Casa on

1    the one hand and our client on the other hand.  It's

2    not about acrimony that may exist with respect to the

3    former lender on the property, and it's really about

4    the question of whether this management should remain

5    in effect and whether we can respect and believe that

6    someone with this history and someone with these

7    apparent financial problems is capable of exercising

8    the duties and the responsibilities of a fiduciary in

9    charge of a debtor-in-possession under Chapter 11.  We

10   don't believe that that is so.  The manipulation of

11   the discovery process before Judge Ray is one thing,

12   but a lot of that is gamesmanship.

13            Fundamentally what it comes down to is the

14   issue of whether this management needs to be replaced.

15   If I can just go quickly through some of the factors

16   that were discussed in Your Honor's decision that

17   dealt with an 1104 trustee involving Mr. Scutieri.

18            THE COURT:  In Re: Sundale for the record.

19            MR. BLOOM:  Yes, In Re: Sundale.  We are

20   aware of the strong presumption that a

21   debtor-in-possession remain in possession after the

22   showing of need and I think we reflected a showing of

23   a need through facts that are not in dispute and are

24   matters of public record.  The determination is one

25   that is within the discretion of the Court on a case

1   by case basis based on the totality of the

2   circumstances, provided however that, as Your Honor

3   recognized, if cause in the form of fraud, dishonesty,

4   and incompetence and gross mismanagement are

5   demonstrated to exist, then as Your Honor noted in

6   Sundale, the Court doesn't really have discretion.

7   The Code says a trustee must be appointed.

8           The factors there, very briefly, are the

9   materiality of misconduct by current management and,

10  again, we would look to the amount and the nature of

11  the litigation that Casa and its principal are

12  involved in.  Basically everyone that they've dealt

13  with, over the last several years, and I didn't mean

14  to leave out the trustee for Mr. Rothstein.

15  Mr. Rothstein himself is serving 50 years, of course,

16  in the federal penitentiary, or so we are led to

17  believe, but the trustee for his law firm, Mr. Stettin

18  was in litigation with Mr. Loftin as well.

19          There was an agreement reached to settle

20  that litigation, but the agreement specifically was

21  not binding until approved by Judge Ray.  It has not

22  been approved by Judge Ray, it's not been heard and,

23  of course, if a trustee were to be appointed here,

24  that trustee could investigate the settlement, perhaps

25  reject it as an executory contract, could do all kinds

1   of things, the settlement would have to be approved

2   here on the other side as well.  So, it's not a real

3   settlement, at least, in place right now, but they are

4   in litigation with the Rothstein Rosenthal Adler

5   trustee.

6            The other factors, the next four I can

7   take very quickly together.  Evenhandedness or lack of

8   evenhandedness in dealings with insiders and

9   affiliates, the existence of voidable transfers, the

10  unwillingness or inability to pursue estate causes of

11  action and conflicts of interest that interfere with

12  the ability to fulfill a fiduciary duty.  Again, I

13  come back to the $3 million or more that was paid

14  under the Barton G lease or was to have been paid.  We

15  tried for months in the District Court first, where we

16  had issues establishing diversity of citizenship, but

17  we tried for months to get a hearing on our assignment

18  of rents that, among other things, would have involved

19  an  accounting with respect to the rents that

20  historically had been paid.  We never got it.  We

21  never got it.  To this date there has been no

22  accounting of what has happened to those $3 million or

23  more in rents over a period of three years while all

24  of these things went unpaid.

25            Of course, any insider claims that the

1  Casa estate might have against Mr. Loftin might not
2  really have much weight or much force behind them in
3  light of the prior judgments and tax liens that have
4  been reported in various places around the country,
5  but, you know, those judgments and liens are hardly an
6  excuse.  They're an additional factor that we think
7  the Court should look to, and they go to the issue of
8  self-dealing, waste and squandering of corporate
9  assets that goes beyond $3 million, but the fact that
10 he chased away the sole tenant and that's why we have
11 a vacant property and that's probably one of the
12 reasons that we're here.
13        Where a showing of cause is not made by
14 the requisite standard of evidence, the Court
15 nevertheless has discretion to appoint a trustee based
16 upon the interests of creditors, based upon a series
17 of  factors such as the trustworthiness of current
18 management.  I think we've gone over that.  The
19 debtor-in-possession is past and present performance
20 and prospects for rehabilitation, but this is not a
21 rehabilitation.  I mean, even under the best laid
22 plans that counsel has laid out, there's going to be a
23 liquidation.  It's could be handled just as well by a
24 trustee and a lot of people in this courtroom and on
25 the phone, I think, would sleep better if it were

1   handled by a trustee.

2          Confidence or lack thereof in current

3   management among the business community and creditors,

4   I don't think that horse of a slightly different color

5   needs to be dressed out to trot today, and then the

6   benefits of a trustee versus the cost of appointment.

7   I think that.  On balance, trustee's counsel fees

8   would probably be not much different than those of

9   debtor's counsel and the fees for a trustee on an

10  hourly basis, subject to a three percent cap, at least

11  in our view, that's a fair insurance premium to pay to

12  put competent responsible unconflicted management with

13  integrity in charge of this property and in charge of

14  the sale process that we hope will govern it.

15         So that's all we have to say initially.  I

16  can certainly address any questions that the Court

17  would have, but we just think that it's a compelling

18  record and, again, I thank the Court for affording us

19  all this time.

20         THE COURT:  All right.  Before I go into

21  your evidence binder that you would like me to look

22  at, and when we do I'll ask you in each instance to be

23  prepared to articulate the relevancy, I know you've

24  done so superficially and I don't mean that -- what I

25  mean is that we haven't gone document by document --

1          MR. BLOOM:  Yes.

2          THE COURT:  -- summarily, yes, that would

3    be a better -- but I would like to hear from the other

4    parties and then we'll go back.

5          MR. BLOOM:  Thank you again, Your Honor.

6          THE COURT:  All right.  Thank you.  All

7    right.  So, Mr. Grant, I don't know whether you want

8    to go next or you would rather hear what everybody

9    else has to say, so that you can address everybody's

10   comments.

11         MR. GRANT:  I would like to go next, Your

12   Honor, because I'd like to address what, you know,

13   Mr. Bloom's proffer is just a proffer, Your Honor.

14   None of it is facts that are submitted as evidence --

15         THE COURT:  Well, so far.

16         MR. GRANT:  -- so far, Your Honor.  We

17   would like the opportunity, obviously, to dispute

18   those facts.  We have obviously issues regarding their

19   claims regarding Barton G.. chasing the tenant away.

20   We obviously dispute the fact that anything related to

21   Mr. Loftin personally has any relevance whatsoever to

22   this debtor's ability to reorganize.

23         I would like to go into specifically of

24   what happened with Judge Ray.  Your Honor, my firm

25   entered an appearance on behalf of this debtor before

1    Judge Ray on June 24th.  That was a mere few days

2    after Judge Ray entered an ex parte order -- an order

3    on an ex parte motion to shorten the time period to

4    respond to discovery.  That order was on discovery

5    requesting information related to insurance.  My

6    firm's appearance before Judge Ray was to file a

7    motion to disqualify the lead counsel in that case

8    before Judge Ray, Gunster Yoakley.

9              Our allegations, in that motion was that

10   Gunster Yoakley previously represented Casa Casuarina

11   and, therefore, there was a conflict that required

12   their immediate disqualification.  That is the issue

13   that came up before Judge Ray last week.  It prompted

14   also some additional discovery motions that were

15   before Judge Ray which he entered orders on and then

16   ultimately set a hearing on Monday at two o'clock on a

17   motion to appoint a receiver, but to suggest that

18   somehow we were dilatory or we delayed or that we

19   didn't want to provide that information or there was a

20   substantial delay in producing documents relating to

21   insurance is not the case.

22             I think Mr. Bloom will tell this Court,

23   and he has, that since my firm's involvement, our

24   firm's involvement in representing the debtor, prior

25   to filing this petition we've been absolutely more

1    than forthcoming in terms of getting information to

2    them and sharing information.  We have told them as of

3    Friday that this petition was going to be filed.  The

4    purpose of this bankruptcy petition is not to have a

5    long drawn out Chapter 11 process.  As Your Honor can

6    see from the docket, we've already filed retention

7    applications for Lamar Fisher, for Jason Welt, for

8    Fisher Auction, for the Jills, who are the current

9    listing agents on the property.

10           Obviously, we think that's a proverbial

11   dream team in terms of a combination of bankruptcy

12   auction experience, as well as the pre-eminent elite

13   residential sales team in Miami-Dade County.  The

14   combination of those two, along with a motion that we

15   anticipate filing on Monday to obtain an expedited

16   sales process, we would like to see a sale some time

17   in September, whereby they won't potentially get their

18   claim, the allowed claim --

19           THE COURT:  They meaning?

20           MR. GRANT:  -- they meaning VM South

21   Beach.  They would be whatever their allowed claim

22   decides to be and, again, there's defenses and

23   disputes that we have with respect to that.  So it's

24   not as cut and dry as Mr. Bloom would make this Court

25   believe.

1          There are legitimate defenses regarding

2   their standing in the case, regarding defenses that

3   have been asserted in previous pleadings, and we would

4   like an opportunity to present those to the court.

5          So, to suggest that there was any type of

6   gross mismanagement or anything that would necessitate

7   the appointment of a trustee, I just -- we just don't

8   see it, Your Honor, especially on a non-evidentiary

9   basis on 48 hours after filing the case.

10         The insurance coverage, Your Honor.  Since

11  filing the petition and I have here in the courtroom

12  Mr. Draft, and he is an insurance broker who has been

13  spearheading the efforts of the debtor to obtain

14  insurance.  This morning we conducted a wind loss

15  mitigation.  That is necessary in order for the

16  insurance company, Lexington Insurance Company is

17  prepared to write a policy sufficient to comply with

18  the terms of the loan documents in terms of the amount

19  of insurance and the adequacy -- yes, Your Honor?

20         THE COURT:  Slow down.  You had a

21  mitigation inspection this morning?

22         MR. GRANT:  Yes, Your Honor.

23         THE COURT:  Okay.  Is Lexington going to

24  be insuring windstorm or just liability?

25         MR. GRANT:  It's windstorm and liability.

1    Then we also --

2              THE COURT:  And property?

3              MR. GRANT:  Yes, and property.  As I said,

4    whatever -- there are specific items in Mr. Bloom's

5    motion, VM South Beach's motion, regarding the amount

6    of insurance and what the requirements are.  We

7    believe we are going to obtain those amounts of

8    appropriate coverage within just a few days.

9    Obviously, July 4th is interfering with it getting

10   done this week.  We anticipate that it's going to get

11   done early next week.  Once the wind mitigation gets

12   brought to the insurance company, we believe we will

13   be able to place insurance at the appropriate level by

14   the middle of next week.  I just say the middle of

15   next week because I don't know what will happen as far

16   as tomorrow and Friday.

17             THE COURT:  Define appropriate level.

18             MR. GRANT:  The appropriate level, the

19   loan documents are very specific.  There's an exhibit

20   attached to the loan documents that itemized what the

21   amounts of insurance are.  I think it's 20 million,

22   there's $7 million for personal property.  There's a

23   $500,000 flood, which by the way, we already have, we

24   can bind flood now.  If we weren't here in court

25   today, Your Honor, we would already have the flood

1    policy in place.  We already have a quote for that.

2                THE COURT:  It's four o'clock.  What were

3    you doing all day?

4                MR. GRANT:  Your Honor, that just came in

5    about three o'clock.  So, what I'm suggesting is to

6    say that this is some type of gross management where

7    these things aren't being done, VM is well aware of

8    what we are doing because we've been keeping them

9    informed of it.

10               THE COURT:  And Mr. Bloom so stated.

11               MR. GRANT:  So, I believe in a very short

12   period of time, Your Honor, 48 hours, we have already

13   demonstrated that there is good faith.  We anticipate,

14   as I said, filing the sale motion in order to get the

15   -- we want the professionals to get retained.  We'd

16   like to file the sale process because, as I said,

17   Your Honor, our plan is not to be in this bankruptcy

18   case for a substantial period of time.  We would like

19   to get the sale process for 60 days, which will be

20   some time in September.

21               As for the inspection on the premises,

22   Your Honor, I advised VM South Beach, we'll schedule

23   it.  You want to come in, you're the secured lender,

24   obviously, so you have an opportunity to come in.  If

25   you want to do it on Friday, Saturday, Sunday,

1   obviously, I think tomorrow is unavailable for most

2   people, they have every right to come and inspect the

3   premises.  So we have no opposition to that, and I am

4   willing to coordinate that date and time with

5   Mr. Bloom and his clients, so whatever professionals

6   he wants to bring in on their behalf will be able to

7   come in and inspect this property.

8           As I said, Your Honor, we have substantial

9   defenses and substantial factual issues that I believe

10  we can show this Court.  One of the cases that I

11  looked to, Your Honor, and I cited it in my response,

12  which by the way, unfortunately, my response was not

13  able to rebut all the claims that Mr. Bloom said

14  because his motion didn't contain all of that stuff.

15  It had nothing regarding the debtor's previous conduct

16  prior to filing the petition.  It pretty much directed

17  this Court to the two main issues and that is

18  insurance and security.

19          So I would like the opportunity to

20  obviously to appropriately respond to that in a brief.

21  We were not prepared that all of that was going to

22  come out at today's hearing in terms of what happened

23  with Barton G.  The insurance, Your Honor, has

24  indicated, the tenant left, vacated the premises on

25  May 31st.  We were under the impression that there was

1   still insurance in place because under the lease they

2   were required to maintain insurance, which they did.

3   So, we're only talking about a 30 day or 25-day period

4   where there was no insurance.  My client obtained

5   insurance on June 25th, now disputed, yes, maybe it's

6   not in the adequate amount, but we're trying to

7   rectify that right now, and we just need a couple of

8   days to do this.

9            THE COURT:  By the way, before I forget

10  now that your client is bankruptcy, Mr. Bloom's client

11  is not the only person who you have to satisfy

12  regarding the level of insurance.

13            MR. GRANT:  Yes, Your Honor.  I agree.

14            THE COURT:  And the level of insurance in

15  the loan documents seems to be woefully inadequate

16  based on what appears to be what you believe the value

17  of the property is.  So that gentleman over there,

18  Mr. Rodriguez, is the person who you're going to have

19  to make happy.

20            MR. GRANT:  Yes, Your Honor.  At this

21  time we haven't yet had an opportunity to see what

22  issues the U.S. Trustee may have regarding the amount

23  of insurance.  We have obviously been strictly dealing

24  with VM South Beach just because of the compressed

25  time period within which, you know, all of this was

1    taking place.

2              You know, as Your Honor pointed out, we

3    anticipate filing an expedited sale motion on Monday,

4    which will, hopefully, Your Honor may be able,

5    depending on whatever the calendar is, get that heard

6    so we can demonstrate to this Court that we have every

7    intention of getting a sale in place which will pay

8    all creditors.  There are equity holders, by the way,

9    there is one equity holder, obviously, the debtor.  So

10   after all the claims are paid, there could be a

11   substantial amount of equity that remains in the

12   property.

13             You know, I would suggest under 1104(a)(1)

14   no evidence was presented to the court regarding

15   mismanagement, except for allegations regarding stuff

16   that happened long prior to the filing of this case.

17             THE COURT:  But I haven't taken any

18   evidence yet.

19             MR. GRANT:  I know.  I would say with

20   respect to 1104(a)(2), Your Honor, though, it says,

21   states in the best interests of creditors and equity

22   holders.  It's not in the best interest of an equity

23   holder to have a trustee in place that's going to

24   incur the expenses related to the auction and the sale

25   process, which we're already streamlined and capable

1    of doing.

2              You know, we have the team in place.  We

3    have the process in place.  We're ready to go forward.

4    A trustee is only going to delay the insurance.  It's

5    only going to delay the sale process.  You know, we're

6    here.  One of two things I think could happen, Your

7    Honor.  I think obviously the imposition of a trustee

8    is an extraordinary measure.  Your Sundale case says

9    as much, Your Honor.  There are less extreme

10   alternatives.

11             One is, to give the debtor sufficient time

12   to procure insurance.  The other is to give VM South

13   Beach an opportunity to procure insurance at which

14   point they'd likely have a claim out of a sale

15   proceeds when the property sells in 60 days.  Either

16   one of those can be accomplished without the cost and

17   necessity to appoint a trustee that would step in and

18   interfere with that process.  I think either one of

19   those two are a viable alternative to having the

20   imposition of a trustee on an emergency basis,

21   Your Honor.

22             THE COURT:  Okay.  Well, I just want to

23   stop you and again, I apologize for continuing to

24   interrupt, but at my age sometimes I have to say

25   things when they come to mind or they're lost forever.

1        I just want to remind you again, that now,

2   as you pointed out in your pleading, you are in this

3   Bankruptcy Court in a different structure and a

4   different framework than when you were before Judge

5   Ray.  Forced place insurance by the lender when the

6   lender's loan amount, according to you, is

7   significantly lower than the value of the property is

8   not going to satisfy the requirements that you must

9   meet, and so, that is not a viable alternative.  That

10  might make Mr. Bloom's client feel warm and fuzzy,

11  but, as I said before, you have to make Mr. Rodriguez

12  feel warm and fuzzy.

13        MR. GRANT:  Yes.  And I would hope that

14  the time comes, literally, the time comes where I can

15  speak to Mr. Rodriguez about that issue.  If there's

16  additional insurance that needs to be in place, that's

17  what we're going to work to resolve.

18        THE COURT:  What are you suggesting?  When

19  I read the Fisher motion, I didn't see a price.  It's

20  a very pretty brochure, but I didn't remember seeing a

21  price.

22        MR. GRANT:  As far as the property?  The

23  current listing agreement is 75 million.

24        THE COURT:  So, Mr. Rodriguez, am I

25  stepping outside of my bounds to suggest that that's

1  going to be the number closer to which you expect

2  insurance to be?

3          MR. RODRIGUEZ:  I was talking to

4  Mr. Schneiderman, Your Honor.  What was the number?

5          THE COURT: 75 million is what the property

6  is listed for.  I am not ordering anything now, I'm

7  just telling you, you need to be thinking about this.

8          MR. GRANT:  I --

9          MR. RODRIGUEZ:  Without saying anything

10  further, Your Honor, it's definitely going to have to

11  be more than Mr. Bloom's claim.  Whether it's 75, 50,

12  60, 65, I guess we'll have a further conversation

13  since a lot of this just is allegations about me

14  looking at the documents, but the number is not going

15  to be 20, if that's what he's thinking by, you know,

16  next week or something like that.

17          THE COURT:  Okay.  I just want to make

18  sure that everybody knew the framework under

19  which this --

20          MR. GRANT:  We're in the process of doing

21  an appraisal, Your Honor, but there is actually an

22  underlying land value, too.  So, one, you have to

23  structure.  I know you're not talking about the

24  amount.

25          I'd be happy to talk to Mr. Rodriguez

1    about what amount would be sufficient, whether it's an

2    amount required to pay the secured creditor, as well

3    as any of the claims that ultimately gets filed in the

4    case.  We haven't yet filed schedules because we just

5    didn't have the time, but in terms of the anticipated

6    payment of all those claims, I mean, I understand what

7    Your Honor is saying and I appreciate that, and if the

8    amount can be negotiated and discussed, obviously, if

9    a trustee gets appointed, it changes what happens

10   here.  We would say that we should be given sufficient

11   time.

12          What I would be asking this Court is for

13   the end of next week, just like I said, given the time

14   period, we've already put the wheels in motion in

15   terms of insurance.  We're obviously consenting to VM

16   South Beach getting in there on their own, and looking

17   for a way to force place insurance on the property,

18   work hand in hand on something, and come back before

19   this Court at the end of next week to present to this

20   Court what has happened in terms of the quantity of

21   insurance, whether it's sufficient, whether it's

22   enough to satisfy not only VM South Beach, but the

23   U.S. Trustee's office as well.

24          We just need enough time to do that, and

25   as I say, again, we've only been in this case two

1   days, Your Honor, and, you know, basically, I reserve

2   the fact that in terms of all of the evidentiary

3   issues that were presented, I think that requires a

4   more lengthy hearing than we probably have time here

5   today.  But I've already said it, Your Honor, we have

6   defenses.  There are disputed claims, relevancy issues

7   that we will assert at the appropriate time.

8           THE COURT:  All right.  What else did you

9   want to share with me before I hear from other

10  interested parties?

11          MR. GRANT:  At this point, Your Honor, I

12  think I've laid out for you what I think is our

13  streamlined plan to get a sale done quickly.  We have

14  the professionals lined up in place.  We're going to

15  have the insurance coverage in place, at least

16  depending on whatever that amount is going to be.  We

17  believe we put together a team of professionals that

18  are accomplished in this market.  They know what

19  they're doing.  We can get this done for -- to

20  everyone's satisfaction within a very short period of

21  time.  And I think that demonstrates to this Court

22  that management knows what they're doing, Mr. Loftin

23  knows what he's doing.  We have retained the

24  appropriate professionals and we're looking to move

25  forward to get this process implemented as quickly as

1   possible, but for the issues that we're dealing with

2   here today.

3           THE COURT:  Now let's talk about security.

4           MR. GRANT:  Yes, Your Honor.  Thank you

5   for reminding me.

6           Security right now, Mr. -- ever since the

7   tenant vacated on May 31st --

8           THE COURT:  We're talking about Barton G.,

9   the tenant, not the Miami Beach police officer.

10          MR. GRANT:  Right.  When Barton G. Vacated

11  the premises, my client went to a contact of his, a

12  sergeant with the Miami Beach Police Department who

13  moved into the premises with his wife and three

14  children.  So he is there full-time, except for when

15  he goes work.  It happens to be his precinct that the

16  property is located.  His car is parked out in front

17  at all times.  So whether he is off duty or on duty,

18  him and everyone else that is under his patrol is

19  monitoring security of that property.  So, it is an

20  actual residence, Your Honor.  There is nothing in the

21  loan documents that requires insurance, but you can

22  bet that every officer --

23          THE COURT:  You mean security?

24          MR. GRANT:  Security.  You can bet that

25  every officer that is under his patrol is making --

1   the police station is only a block away from the

2   property, by the way, Your Honor.

3            THE COURT:  It did a lot of good for the

4   last resident.

5            MR. GRANT:  Yes.  So the officers under

6   his patrol are there to monitor what is going on.  We

7   have, however, also contacted a security company, and

8   I provided Mr. Bloom a copy of that security contract,

9   and that was a proposal that I wanted more time to

10  discuss with him.  We are willing to entertain

11  employing a 24/7 security force, at an expense,

12  obviously, to the estate which would cover their

13  concerns to have 24/7 round-the-clock security to

14  patrol the premises until we can actually have a sale.

15  That was something that I forwarded to Mr. Bloom

16  today. So, we are prepared to add to that, just like

17  we're trying to add the insurance.

18            We're really trying to show this Court and

19  everyone, all the creditor constituencies, that we are

20  pushing this process forward.  We are prepared to do

21  whatever it takes in order to have an orderly

22  liquidation within a very short period of time.  And

23  if that means add additional security, add additional

24  insurance, we're prepared to do that, Your Honor, but

25  we just need sufficient time to do that.  And given

1   that it's only been 48 hours since the petition, we

2   just need a few extra days in order to implement it,

3   Your Honor.

4              THE COURT:  Okay.  Thank you.

5              MR. GRANT:  Thank you.

6              THE COURT:  All right.  Let me hear next

7   from the U.S. Trustee.

8              MR. RODRIGUEZ:  Good afternoon,

9   Your Honor.  I guess, listening to this, Your Honor,

10  it looks like we need another hearing.  I know

11  Mr. Bloom wants to present some documents in support

12  of his motion, but listening to all sides I'm not sure

13  we have enough to appoint a trustee.

14             However, I've got some concerns and I want

15  to go over them, to the extent we do have a continued

16  hearing, which I believe it should be hopefully next

17  week, there's got to be some conditions in place.

18             Number one, counsel said he's going to

19  file the motion for the sale process by Monday.  Well,

20  let's see it.  If the debtor is serious and the

21  principal is serious, let's get that motion done and

22  filed by Monday.

23             As for insurance, I mean, I think we've

24  heard enough and I think we gave the debtor the

25  benefit of the doubt, but again, as Your Honor stated,

1    it's got to be more than just the mortgage or the

2    claim being asserted by Mr. Bloom's client.  It's got

3    to be, you know, close to the value of the property or

4    the claims being asserted against the estate.

5              So, we need more information and they have

6    to, you know, be in contact with us to discuss that

7    further.  So if they're just going to come here next

8    week and just say, we have a $20 million policy, it's

9    going to be unacceptable to us.

10             Your Honor, as for security, I'm

11   uncomfortable with it.  First of all, I have no idea

12   whether this sergeant is violating Miami Beach City

13   policies.  You know, he is living at a very well

14   established residence.  I'm not sure if he's living

15   there rent free.  I know he's a sergeant and has other

16   patrolman looking at the Versace, but it just seems

17   unusual that he's having his policemen protecting one

18   mansion, when they should be doing other stuff for

19   Miami Beach.

20             So, if the debtor is serious about a

21   security company, that's got to be done soon and have

22   the sergeant out because I don't know what he's been

23   doing there.  We have no evidence as whether there's

24   been any damage done.  I'm not saying there has been,

25   but no one --

1          THE COURT:  Well, there are three

2   children, so we can assume.

3          MR. RODRIGUEZ:  Well, there are three

4   children.  So I guess there could be some damage, I

5   have four, so there could be some damage in the last

6   30 days.  But it just sounds very fishy when you have

7   a sergeant living there rent free, has a car parked,

8   who knows what he does.

9          Is he -- did he get prior approval from

10  the City of Miami Beach to sub this arrangement and

11  what you've seen in instances of public officials

12  accepting gifts or -- so, that's what makes me

13  uncomfortable.  So there has been some security in

14  place.  I hope we get that done within the next seven

15  days, obviously, to the satisfaction of Mr. Bloom.

16          As for the other issue was -- I'm sorry.

17  I'm losing my thought, Your Honor.  Oh, as for the

18  inspection, I know Mr. Bloom's client wants to go

19  there, it should happen today or tomorrow.  I don't

20  think that Mr. Bloom should wait any further, if he

21  wants to go there today, this afternoon or tonight to

22  see the property.  I mean, I think they've waited long

23  enough.  If the principal is serious about giving

24  access to the lender, then let them have access

25  tonight.  There should be no reason why the lender

1   should not be allowed to be in that property tonight,

2   just to at least go in and look at it.

3           Obviously, if he wants to have other

4   professionals to go in there and do more a thorough

5   inspection, fine, perhaps further arrangements have to

6   be done, but there is no reason why they can't go in

7   there tonight and at least, you know, a one hour

8   inspection just to have a walk-through through the

9   property.

10          Beyond that, Your Honor, I mean a lot of

11  this is allegations and we don't have testimony here.

12  I mean, I know there's a lot of documents that have

13  been floating around, but I don't see enough to have a

14  trustee appointed.  Perhaps, I guess I'm on the fence

15  to some degree, but we definitely need another hearing

16  where we can take testimony, talk about, you know, the

17  allegations being raised by Mr. Grant and by Mr.

18  Bloom.

19          I know you have a busy calendar in the

20  next seven days.  Ideally next week, but if not, you

21  know, the week after.  I mean, last time I checked I

22  saw WSVN, you know, comb of danger, there's no

23  hurricane that's coming in the next five to seven

24  days.  So, I think, that threat is out the window, but

25  unless there's another dire emergency in place that

Page 44

1    I'm not aware of, it looks to me like we can have a

2    hearing in the next two weeks.

3                THE COURT:  We just won't think about the

4    fireworks.

5                MR. RODRIGUEZ:  Well, the fireworks.  I

6    mean that's another possibility, but those are done in

7    barges, unless we have some people, some stragglers on

8    the sidewalk.  But beyond that, I don't see the other

9    emergency that's, you know, where it's really needed

10   to have a trustee in place today, at this very moment.

11   But there should be conditions if we are going to

12   continue the hearing.

13               THE COURT:  Okay.  Thank you.  Anyone else

14   wish to speak with respect to the motion?

15   Mr. Singerman?

16               MR. SINGERMAN:  May it please the Court.

17   I'll be brief, Your Honor.

18               Your Honor, as Mr. Bloom indicated and I

19   did when I entered my appearance, our firm is counsel

20   to Herbert Stettin, the Chapter 11 trustee for the

21   Chapter 11 bankruptcy estate of Rothstein, Rosenfeldt

22   and Adler.  We have been in litigation with Mr. Loftin

23   individually, and with this debtor entity for quite

24   some time.

25               I will be very direct.  I don't think that

1    Your Honor needs to reach all of the 1104 elements in

2    order to grant the relief that VM South Beach is

3    seeking.   I think it can be easier and that is cause

4    shown and lack of confidence on the part of creditors.

5                This is not an operating company as to

6    which Mr. Loftin could add great value by managing it.

7    This is a non-operating asset.   We agree with

8    Mr. Grant.   There is a dream team of professionals

9    assembled to give advice to the economic stakeholders,

10   including Mr. Loftin, but not exclusively Mr. Loftin.

11   As to the timing to optimize the auction proceeds from

12   the sale of this unique asset and the process by which

13   the sale process should proceed.

14                So we support the relief.   We don't think

15   Your Honor needs to take a great deal of time out of

16   your calendar or otherwise.   Our client, the estate of

17   RRA, owns an equity interest in this entity and has an

18   option to increase the amount of that equities stake

19   up to 49.9 percent and has substantial litigation

20   claims, dollar based, debt based claims for dollars

21   that were transferred out of the estate for the RRA

22   law firm before it was a debtor and used for

23   improvements in this asset.

24                There had been a settlement negotiated

25   over a long period of time, signed, never approved by

1   the Bankruptcy Court, and subject to court approval.

2   So what we envision is the most efficient way to

3   proceed is to appoint a trustee for the VM South

4   Beach, the RRA estate and Mr. Loftin to have input to

5   the trustee in designing the sale process and in

6   executing it, for the trustee to proceed with the

7   dream team to which Mr. Grant has referred to get

8   asset marketed and sold.  That's what Mr. Stettin

9   believes is the appropriate course of action.

10          So we would join in the relief sought for

11  slightly different reasons, easier reasons, we think,

12  for Your Honor to grant the relief as that is sought

13  by VM South Beach.

14          THE COURT:  Okay.  Thank you.

15          MR. SINGERMAN:  Thank you, Your Honor.

16          THE COURT:  Anyone else wish to make an

17  appearance or make a statement?  Ms. Thornton?

18          MS. THORNTON:  Your Honor, so that you

19  know the universe of the tax liability we are speaking

20  of, including 2013 which is still estimated taxes, we

21  are looking at approximately $640,000 of which 276,000

22  is already delinquent, and includes real estate taxes

23  that are held by a tax certificate holder.

24          Obviously, under Florida law the payment

25  of these taxes is secured by first priority liens, and

1  so, we want to make sure that whatever is put in the

2  sale motions or any other relief that any other party

3  has, that the lien priority is not overlooked.

4           We would also suggest given that the

5  personal property taxes haven't been paid since 2007,

6  we would be inclined to join in VM's motion to appoint

7  a trustee because it appears that that is -- will

8  increase the likelihood that the sale will result in

9  the taxes being paid on a more expedited basis.

10          THE COURT:  Do you have any idea how much

11  the personal property taxes are?  I'm assuming the

12  640,000 is the real estate tax.

13          MS. THORNTON:  No, that includes the

14  personal property.  The personal property taxes right

15  now are about $137,390 of delinquent taxes and an

16  estimated 20,650 for 2013.

17          THE COURT:  Okay.  Thank you.  Anyone else

18  wish to speak?  Mr. Schneiderman?

19          MR. SCHNEIDERMAN:  Your Honor, on behalf

20  of the U.S. Trustee, and it may be just more of an

21  observation.  As I said to Mr. Grant, I've been doing

22  this now for over 24 years, not as long as some of the

23  others in the courtroom, Your Honor, but if the debtor

24  is committed to the sale process which the debtor has

25  indicated by filing the motion to retain the brokers

1    and the auctioneer, it may make perfect sense for the

2    debtor to consider this in the interim between now and

3    the next hearing, if Your Honor is going to have a

4    second hearing on this motion, that an independent

5    fiduciary should be appointed.  It will avoid the cost

6    of the litigation which will be borne by the estate.

7    It's going to avoid the negative publicity to this

8    estate, which I don't think anyone wants any dirty

9    laundry aired in the court, which would come and

10   impact the sale price.

11           Obviously, there's an old saying any

12   publicity is good publicity, except when you are

13   trying to use it, Your Honor, in order to negotiate a

14   price down.  And it avoids any of the personal issues

15   that have been discussed here today.  If the debtor is

16   committed to this process, it very well makes sense

17   for the debtor to take that into consideration, that

18   it pull back and look at this more objectively,

19   consider what the end goal is and if the end goal is

20   to sell the property at the highest, maximum price

21   possible with cooperation and input from all sides,

22   instead of a battle for the next 30 to 60 days while

23   the property is being marketed, then it may make sense

24   in order to maximize the value of the return to the

25   insiders to have an independent fiduciary appointed.

1            In my experience, Your Honor, to address
2   one of Mr. Grant's concerns, trustee's don't
3   necessarily drive up the cost of a Chapter 11 case.
4   Trustees come in, they're efficient, they're
5   experienced.  They know how to get their hands around
6   cases quickly.  They know how to set agendas, they
7   know how to put a team in place and know how to meet
8   those goals. Trustees, in my experience, are
9   hardworking, honest, efficient professionals that will
10  generate a very good result in cases when they are
11  needed.

12           Right now the facts as presented by
13  Mr. Bloom make a very strong showing for cause that a
14  trustee is needed.  The debtor has the opportunity to
15  put on a defense to that, but is it necessary in order
16  to achieve the goal here which is to maximize the sale
17  price and get a sale process in motion.  And I just
18  ask the debtor between now and next week -- if you
19  intend to schedule a hearing next week, and Your Honor
20  we ask that it not be Thursday.

21           THE COURT:  Yeah, I hear some of you are
22  busy next week.

23           MR. SCHNEIDERMAN:  Right.  Tousa and
24  Rothstein on Thursday, Your Honor, but that the debtor
25  take that in consideration because, as Mr. Singerman

1   pointed out, it's in the best interest of creditors is

2   one of the issues here.  And if there is distrust, if

3   there is an inability of the creditors to work with

4   current management, I have seen case law, as Your

5   Honor has, that that is sometimes sufficient to

6   appoint a Chapter 11 trustee.  Thank you, Your Honor.

7            THE COURT:  Thank you.  Anyone else before

8   I hear from Mr. Bloom again.  All right.  Mr. Bloom,

9   anything else?

10           MR. BLOOM:  I really don't have anything

11  to add, except to say that in respect to

12  Mr. Singerman's presentation, I think he is well aware

13  that there are certain disputes that exist between the

14  Rothstein trustee and our client, and rather than

15  bring those into the forefront and put the real

16  controversy into the shadows today, I think he and I

17  perhaps are best to agree simply to reserve our

18  positions, but I have nothing further to add on the

19  trustee issue in addition to what's been said, nor on

20  the issue of stay relief.

21           I can say though that if the Court is

22  inclined to give us immediate, as Mr. Rodriguez

23  suggested, like tonight, access to the property, the

24  gentleman in the back is Wayne Black who is a noted

25  security expert and he was engaged initially by

1  Mr. Marod's firm in connection with the foreclosure

2  action.  He confirmed to me by nodding during the

3  hearing that he and some people can go in and make a

4  preliminary inspection at any time the court says.

5  They are not insurance brokers, of course, and to the

6  extent the question of insurance is up in the air, we

7  would want to bring in people to conduct the same type

8  of inspections that Mr. Grant has indicated are

9  necessary to place insurance on their side, but that

10  is all I have to say, no further argument to the

11  court.

12            THE COURT:  Okay.

13            MR. GRANT:  Your Honor, just few brief

14  points, if I may, Your Honor?

15            THE COURT:  Yes.

16            MR. GRANT:  I think Mr. Rodriguez' points

17  are extremely well taken.  We will give them immediate

18  access to the premises if they want to send someone

19  there tonight.  The point I made about tomorrow was

20  that it's unlikely that the inspection people would be

21  able to plan tomorrow, but we don't want to deny them

22  access to the premises.  If Mr. Black wants to make

23  arrangements with us after this hearing to go by there

24  for a preliminary inspection, we welcome it.

25            And I also think Mr. Schneiderman's

1   comments are well taken that, you know, we would like

2   the opportunity to meet with the U.S. Trustee to see

3   what their concerns are, not only about the insurance,

4   but also about the fiduciary.  We just need more time.

5   And so, if Your Honor is inclined to schedule another

6   hearing on this, the only thing that Mr. Marshall and

7   I have next week is Mr. Marshall is before

8   Judge Wolrath in Delaware July 11th and I'm before

9   Judge Kimball on a confirmation hearing on July 11th.

10             THE COURT:  And everybody else will be

11   before Judge Ray on another confirmation hearing on

12   July 11th.

13             MR. GRANT:  Yes.  So, Your Honor, that

14   would be only the conflict that we would have in terms

15   of scheduling over the next, you know, 14 days or so.

16   Thank you, Your Honor.

17             THE COURT:  All right.  I'm not going to

18   appoint a trustee right this second.  I will keep this

19   binder, if you'd like me to, Mr. Dodd, and then I will

20   bring it, resurrect it for when we have the hearing,

21   if we do.  But for those of you who are familiar with

22   the Sundale case or have reviewed my opinion, that

23   case was tried over 12 days over a six month period,

24   at the end of which I did not appoint a trustee.

25             Having said that, I do note that in this

1  particular case Mr. Loftin has essentially not

2  operated the property for the last three and a half

3  years, and, however I may rule at the conclusion of

4  and evidentiary hearing and we'll discuss time after I

5  make my remarks, I think that the debtor should listen

6  very carefully to the points that were raised by Mr.

7  Schneiderman.

8            Now, having said that, even if I were

9  inclined to appoint a trustee today and I did look at

10  your request for judicial notice, Mr. Bloom, prior to

11  this hearing, so, I'm well aware of what's in these

12  binders.  Okay.  Even if I would have, unless there

13  was something so outrageous occurring that required

14  the appointment, the immediate appointment, that was

15  not going to happen today.  Putting aside for a moment

16  that whomever was appointed as trustee would be very

17  unhappy because they would be now holding the bag for

18  the lack of insurance.

19            So, what I'm going to ask you all to do

20  when you leave the floor when we're done, because no

21  one else can leave the floor until all of you leave

22  the floor and that makes our sequestration situation

23  somewhat uncomfortable, but when you continue your

24  conversations in the lobby of the building or outside

25  on the sidewalk, make arrangements then for the lender

1    security expert to go in.

2              I will tell you now that while I

3    appreciate the off-duty police officer's sacrifice in

4    living in the luxury mansion with his family, that's a

5    hard job but somebody has to do it, and I'm not

6    prejudging what arrangements or whether he shouldn't

7    be doing it or should be doing it.  I'm not interested

8    in that.  What I do note is this, is that, yes, this

9    was a private residence, I understand that, but this

10   is a property that now attracts a lot of attention.

11   And it is in a high traffic area of Miami Beach, in a

12   situation where one family, even with a police car out

13   front and even with a patrol, may not necessarily be

14   the right situation.

15             And, again, your client has a duty now

16   greater than just to Mr. Bloom's client or to

17   Mr. Singerman's client.  Although, my recollection is

18   I read somewhere that every time Mr. Singerman says

19   that the trustee in RRA has an ownership interest,

20   someone else says it's alleged.  I don't remember who

21   said it, but it's not for me to decide today.  Okay.

22   But having said that there is some interest asserted,

23   if not actual, it's at least asserted until it's

24   resolved, it's an interest that has to be protected.

25             And, of course, in this case if the

1   property is worth what you say it is or what you hope

2   it is, then your client also has a fiduciary

3   obligation, well, I guess to himself, but -- because

4   if he's the only equity holder, that might be

5   different.  But in any event, there are a lot of

6   moving parts greater than just the lender, but this is

7   something that has to be protected.  It's a valuable

8   asset.

9            With respect to the behavior that has

10  occurred up to now, I'm not going to make any comments

11  on that today.  I'm going to reserve on that until

12  such time as I have an evidentiary hearing.  I think

13  that the law is very clear regarding the criteria that

14  I will look at.  Mr. Singerman is right, that loss of

15  confidence in management is a criteria and it is one

16  that I looked at very closely in the Sundale case and

17  did discuss in that opinion, and it is one that I will

18  consider at such time, if any, that we have the

19  evidentiary hearing.

20            So, for purposes of today, I'm going to

21  direct that the lender be given immediate access to

22  the property to inspect.  I am going to direct you to

23  get that insurance in place ASAP, and it's not for

24  $20 million, okay?  I don't know how much you

25  calculate Mr. Singerman's client's interest, asserted

1  or otherwise, over and above the amounts owed to

2  Mr. Bloom's client, disputed, I understand.

3  Ms. Thornton, of course, is first in line and

4  Mr. Rodriguez and the U.S. Trustee's fees are right

5  behind there.

6           But these are all things that need to be

7  insured and protected, and not just -- that's why I'm

8  saying, if Mr. Bloom's client wants to get forced

9  place insurance, that's great but it's only going to

10  protect his client's interest, not everybody elses

11  interest that needs to be protected.  So, you need to

12  take care of that immediately.

13           MR. GRANT:  Yes, Your Honor.

14           THE COURT:  Okay.  So immediate access.

15  Now I happen to have had a trial that settled.  So, I

16  know for a fact that Monday and Tuesday of the week

17  following, which I think is the 15th and the 16th, is

18  that right?  Whatever that Monday and Tuesday -- okay.

19  The 15th and 16th, that both of those days are open.

20  I can give you the 12th, but I assume that there are a

21  lot of people that are going to be working on other

22  things and the appointment of a trustee is a very

23  serious issue.

24           And so, yes, I understand that it means

25  that people have to work over the weekend to get

1  prepared, if you don't resolve, but there's nothing I

2  can do about that.  So, I know for a fact I can tell

3  you now that I have those two days available.  If

4  those two days are not good, I have Friday before,

5  which is the 12th.  Other than that, it would have to

6  wait until the following week because I have very full

7  calendar on Wednesday and Thursday I leave town for a

8  conference that I must attend.  So --

9        MR. RODRIGUEZ:  Your Honor, as for the

10 dates, I don't think we have a problem with the date,

11 but it would be extremely helpful if those schedules

12 are filed before the next hearing.

13       THE COURT:  Well, I'm going to get to

14 that.

15       MR. RODRIGUEZ:  I don't want to see

16 another extension of time.

17       THE COURT:  Right.  Okay.  So there are

18 some things that have to happen.  You need to get the

19 schedules done because one of the things that's going

20 to dictate the insurance levels is going to be at

21 least what you would estimate are the amount of claims

22 related to the property.

23       Number two, you're going to get that

24 insurance in place and somebody is going to be

25 arranging for security, whether it's Mr. Bloom's

1    client or his expert or the security company that you

2    hire, there needs to be 24/7 security on this

3    property.  And the schedules, I've addressed the

4    schedules.  I've addressed the insurance.  I've

5    addressed the further evidentiary hearing, I think.

6              Is there anything else to get us past --

7    to get us to the next hearing?

8              MR. GRANT:  I think Mr. Rodriguez also

9    wanted an expedited sale motion which we will file on

10   Monday or over the weekend.

11             THE COURT:  Okay.  You can file it over

12   the weekend, but nothing is going to happen to it

13   until Monday.

14             MR. GRANT:  Yes, Your Honor.

15             THE COURT:  Okay.  I know it's a different

16   world now.  I said that in an earlier hearing, I

17   thankfully went on Bench right before e-filing.  So, I

18   have no idea how it works.  I just know what it looks

19   like when it gets to me.

20             So, having said that, this is very

21   valuable piece of property and so, yes, I think it's

22   important that you put your cards on the table.  You

23   started by virtue of the motion to retain that you

24   have filed, but one of the things that I will be

25   looking at in determining whether to appoint a trustee

1   is going to be the efforts made.

2                I do want to again reiterate that I will

3   also take into account what's been going on with the

4   property for the last few years and whether it makes

5   sense -- what extra knowledge Mr. Loftin has as

6   opposed to an independent trustee that might save the

7   estate costs, but we'll see about that.  I'm not

8   prejudging anything.

9                Yes, Mr. Rodriguez?

10                MR. RODRIGUEZ:  Your Honor, as for the

11   motions that have been filed, the employment

12   applications, should I tell Ms. Sanabria to set those

13   for the same date, perhaps?

14                THE COURT:  Yes.

15                MR. RODRIGUEZ:  Okay.

16                THE COURT:  Okay.  So we have the 12th,

17   the 15th or the 16th.  I don't care which of those

18   days.

19                MR. SCHNEIDERMAN:  Your Honor, we will

20   request the 15th.

21                THE COURT:  Well, I wasn't done talking,

22   but I didn't want to interrupt Mr. Grant and his

23   colleague.  Okay.  I'm just going to say this so that

24   we don't forget it for next time.  There's a couple of

25   things that make me a little hot under the collar,

1   although I'm working on it, and one is if I'm talking

2   and someone else starts talking to the same person

3   that I'm talking to, whether it's in general or

4   specific.  Another is, if I am talking to someone and

5   someone comes up to the person to whom I am talking

6   and starts talking to that person.  I have been known,

7   unfortunately, to lose my temper when that occurs, but

8   I'm giving everybody fair warning.  I will do my best

9   not to get upset, but please try to avoid making me

10  get upset.  All right.  Now back to this.

11              In the meantime, whatever day you all get

12  for the evidentiary hearing, if you decide to go

13  forward rather than resolving it consensually, we will

14  go forward but I do urge the parties to try to figure

15  out a way to move forward as long as there is adequate

16  insurance in place, and, as I said, Mr. Grant, now you

17  need to make Mr. Rodriguez happy, it's not all about

18  Mr. Bloom's client anymore.  And the second would be

19  getting that security in place, as soon as possible.

20              Now, remind me, the property right now

21  just has $6 million in insurance?

22              MR. GRANT:  Yes, Your Honor.  Six million

23  dollars.

24              THE COURT:  Okay.  Well, lets just hope

25  that all the fireworks stay where they're supposed to

1    this weekend.

2              All right.  Is there anything else?  So,

3    Mr. Bloom, with respect to your motions.  Your motion

4    for stay relief is granted insofar as you can go in,

5    do the inspections.  If you choose to put your own

6    insurance in place, that's fine.  If you and the

7    debtor agree that your client is going to fund

8    security for now, then you all can work out later how

9    that plays out on the administrative cost.  So that

10   motion is granted to that extent.

11             The motion for appointment of trustee is

12   scheduled for evidentiary hearing.  Surprise me, just

13   make sure that whatever date you get is put into the

14   order, so that nothing is submitted with blanks.

15             All right.  Have I forgotten anything?

16             MR. BLOOM:  Nothing forgotten, but two

17   points.  Recognizing and appreciating the court's

18   direction that the debtor file certain things and

19   obtain insurance forthwith, we would very much like to

20   see some deadlines on that, if the court is inclined

21   to impose them.  For example, a deadline to file the

22   363 motion.  So that we can -- I can tell you that for

23   our client what we see in that motion will go a long

24   way towards determining whether or on what terms we

25   can reach some hopefully consensual resolution with

1   the debtor.

2          There's a big difference in terms of

3   insurance and security between Monday and Friday, and

4   we would like if the Court could fix a deadline by

5   which they are to file a notice reflecting the

6   existence of insurance coverage and security.  I just

7   think it would be helpful, given how many people have

8   appeared today on short notice and obviously have an

9   interest in these issues, if we could see something

10  filed in the public record to reflect these things.

11          THE COURT:  That's a fair comment.

12  Mr. Grant, I'm assuming insurance can be -- insurance

13  you had said that -- I forgot the gentleman's name,

14  Mr. Graft.

15          MR. GRANT:  Mr. Draft.

16          THE COURT:  Mr. Draft, okay.  So when is

17  that Lexington Insurance going to be in place?

18          MR. GRANT:  May I speak to him,

19  Your Honor?

20          THE COURT:  Yes, absolutely.  Go ahead.

21          MR. GRANT:  Wednesday is possible, Your

22  Honor, but definitely by Friday.

23          THE COURT:  Okay.  So no later than Friday

24  insurance in an amount to make Mr. Rodriguez happy.

25          MR. GRANT:  Friday, July 12th.

1        THE COURT:  Yes, a week from Friday.

2   Security, however, needs to be in place by Friday,

3   this Friday.

4            MR. GRANT:  July 5th.

5            THE COURT:  Yes.

6            MR. GRANT:  Thank you, Your Honor.

7            THE COURT:  Okay.

8            MR. GRANT:  The schedules, Your Honor, I

9   anticipate that I can probably get those over the

10  weekend, and I know I can get those filed by Tuesday.

11        THE COURT:  Well, I would rather have a

12  realistic deadline.  So you tell me.

13        MR. GRANT:  Friday the 12th would be

14  appropriate because filing them on the 12th would give

15  everyone involved the -- because I'm expecting the

16  15th would be the date of the hearing.  So the 12th

17  would certainly be sufficient time to let everyone

18  know, including the Court, what the scheduled claims

19  would be.  If that's not sufficient time, let me know

20  and I'd be happy to work whatever needs be to get that

21  done.

22            THE COURT:  Mr. Rodriguez?

23            MR. RODRIGUEZ:  Can we have it the 12th by

24  noon, Your Honor, and at least I'd have the afternoon

25  to review it?

Page 64

1           MR. GRANT:  Yes, Your Honor.

2           THE COURT:  Okay.

3           MR. GRANT:  The sale motion I promised by

4   Monday.

5           THE COURT:  Right.  That's fine, but I

6   want to make this observation.  If there are -- fine,

7   file it by the end of the day on Monday.

8           MR. GRANT:  Thank you, Your Honor.

9           THE COURT:  Because to the extent,

10  Mr. Bloom, that you have some thoughts that you want

11  to share with Mr. Grant, that will give you time to

12  share them with Mr. Grant, and if Mr. Grant agrees,

13  then that can be incorporated in the motion.

14          Obviously, that conversation can take

15  place after the motion is filed, but if there are

16  conversations that can take place before, better.  So,

17  no later than 4:30 p.m. on Friday, and what did I

18  learn today is, don't put it in the cue at 4:30 to be

19  filed, make sure it is filed by 4:30.

20          MR. GRANT:  4:30 on Friday or 4:30 on

21  Monday, Your Honor?

22          THE COURT:  Monday.  The sale motion.

23          MR. GRANT:  Yes.

24          THE COURT:  The sale motion.

25          MR. GRANT:  Okay.

1           THE COURT:  Yes, sir.

2           MR. BLOOM:  The only other thing is that

3    if we are going forward with the evidentiary hearing

4    on July 15th, that no one in this courtroom really

5    knows yet, we would like to be able to take

6    Mr. Loftin's deposition before then and we can do it

7    Friday the 12th, if --

8           THE COURT:  Well, you can decide on the

9    deadline with Mr. Grant.  If there is going to be that

10   type of discovery, if you'd rather have the hearing on

11   Tuesday the 16th, that's fine also.  But the 15th or

12   16th if any party wants to take discovery, because of

13   the short notice, if the hearing is going to be

14   Monday, then discovery would have to concluded by next

15   Friday.

16           I just don't want to put a disadvantage --

17   I recognize Mr. Grant said he has a confirmation

18   hearing before Judge Kimball.  You're going to

19   Delaware, Mr. Singerman and Mr. Schneiderman are a

20   little distracted on the 11th.  So, I just, maybe

21   realistically, if everybody is available on the 16th,

22   we should make it the 16th and make discovery cut-off

23   on noon on the 15th.

24           MR. BLOOM:  I would not want to set that

25   deposition at least in connection with this matter any

1  earlier than necessary because they have a lot to do.

2  I don't want to interfere with what they have said

3  they're going to do and what the Court has ordered

4  them to do.  I'd rather talk and see if we can resolve

5  something and then if not, we'll all know, say by

6  Wednesday and go forward as we need to prepare for the

7  hearing.

8         THE COURT:  Okay.  So, Mr. Grant, why

9  don't you see if Mr. Loftin is available for

10 deposition on Friday.

11        MR. GRANT:  I will, Your Honor.

12        THE COURT:  If need be.

13        MR. GRANT:  We will work with them in

14 terms of any type of discovery.

15        MR. SINGERMAN:  Your Honor, may I ask you

16 that you also suggest or direct to the debtor's

17 counsel that the RRA estate be included in the

18 discussions about scheduling of discovery?  I

19 personally won't be involved, but one of my colleagues

20 will be.

21        THE COURT:  Right.  I understand you will

22 be busy, Mr. Singerman.

23        MR. SINGERMAN:  Thank you, Your Honor.

24        THE COURT:  Okay.

25        MR. GRANT:  I'll be happy to give him

1    information, Your Honor.

2              THE COURT:  Okay.  So is there anything

3    else that we need to do today?  No.  Okay.  Then I

4    will be available generally if anybody needs me.

5    Otherwise, I will maybe see you all next week or the

6    week after.  Thank you very much.

7              MR. GRANT:  Thank you.

8              (Thereupon, the hearing was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3    STATE OF FLORIDA )

4                       )

5    COUNTY OF MIAMI-DADE)

6

7            I, Carmen E. De La Cruz, Shorthand Reporter

8    and Notary Public in and for the State of Florida at

9    Large, do hereby certify that the foregoing

10   proceedings were taken before me at the date and place

11   as stated in the caption hereto on Page 1; that the

12   foregoing computer-aided transcription is a true

13   record of my stenographic notes taken at said

14   proceedings.

15

16

17           WITNESS my hand this 11th day of July, 2013.

18

19

20           _____

21           Carmen E. De La Cruz

22           Court Reporter and Notary Public

23           DD545111 Expiration Date 08/2014

24

25